In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.

In re REFUNDING THE COST OF SIDETRACK IMPROVEMENTS.

No. 70–347.

United States District Court, E. D. Pennsylvania.

Sept. 18, 1979.

Robert Szwajkos, James E. Howard, Carl Helmetag, Jr., Philadelphia, Pa., for Penn Central Corp.

Bernard J. Smolens, Philadelphia, Pa., for GM and Stratford, petitioners.

Laurence Z. Shiekman, Philadelphia, Pa., for ConRail.

## MEMORANDUM AND ORDER NO. 3997

FULLAM, District Judge.

General Motors Corporation ("GM") and two Connecticut-based corporations, Stratford Land and Improvement Company, Inc. and Stratford Industrial Corporation (jointly referred to herein as "Stratford") have filed petitions to compel Penn Central to pay, as a cost of administration, certain refunds allegedly due in connection with three sidetrack agreements. While each of the three agreements must be considered separately in light of their differing provisions, the petitions raise issues which are common to scores of similar agreements throughout the Penn Central system.

## I. BACKGROUND

Generally speaking, a railroad is required by law to provide freight service to shippers, but is not required to incur the expense of constructing the sidings, lead tracks, and switch connections to provide service to the shipper's plant or other facility. But it is in the best interests of the railroad to increase its revenues by increasing its volume of freight business. Hence, a shipper who is willing to pay for the construction of a siding or lead track, switches, etc., is often permitted to recoup his investment in the form of reduced freight charges or rebates, or some equivalent schedule of reimbursement tied to the amount of freight business generated. Typically, the shipper would deposit with the railroad the entire cost of construction, and would convey to the railroad the necessary easements. The railroad would then cause the work to be done and, when the track was placed in service, would reimburse the shipper periodically, at the rate of X dollars per car load. In some instances, the railroad would be obliged to continue making refunds until the entire cost was reimbursed. In other instances, the reimbursement obligation would terminate after a specified number of years (usually, five years for a single siding, ten years for an industrial park) or when the full cost had been reimbursed, whichever should first occur.

At an early stage in the Penn Central reorganization, on March 12, 1971, this Court entered Order No. 183, which (1) authorized the Trustees to negotiate renewals of side-track arrangements which were outstanding and not fully performed on the date of bankruptcy, and (2) conferred blanket authority upon the Trustees to enter into new sidetrack arrangements, in their discretion, so long as their reimbursement obligation did not exceed $100,000; and (3) contemplated continuation of the practice of submitting to the Court for approval all proposed new sidetrack arrangements where the reimbursable cost of construction was in excess of $100,000. The fundamental question presented by the petitions now before the Court is whether Penn Central has any obligation to reimburse to shippers that portion of the cost of sidetrack construction which remained outstanding on April 1, 1976, the date the railroad was conveyed to ConRail.

On October 1, 1973, pursuant to the blanket authorization of Order No. 183, the Trustees and GM entered into the "Piquette Avenue Agreement." GM advanced the construction costs, amounting to $86,486, and was to be repaid at the rate of $20 per car originated. As of April 1, 1976, the Trustees had refunded a total of $7,740, leaving a balance of $78,746.

On July 15, 1974, pursuant to the specific authorization set forth in this Court's Order No. 1614, dated July 11, 1974, the Trustees and GM entered into the "Clark Avenue

Agreement." GM advanced the total cost of $684,137, which was to be refunded at the rate of $54.73 per car. As of April 1, 1976, the Trustees had refunded a total of $550,584.80, leaving a balance of $133,-553.20. Thus, the total amount of reimbursement which GM has not yet received is $212,299.20.

On January 18, 1971, pursuant to the specific authorization set forth in Order No. 128 of this Court, the Trustees and Stratford entered into the "Stratford Agreement." Stratford advanced a total of $689,-000, refundable at per-car rates ranging from $10 per car for cars yielding revenue of $150 to $200, to $50 per car for cars yielding more than $450 in revenues. As of April 1, 1976, the Trustees had refunded a total of $257,510, leaving an unreimbursed balance of $421,490.

The petitioners brought suit in the Special Court seeking to compel either ConRail or Penn Central to carry out the balance of the reimbursement obligation. The Special Court concluded that these sidetrack agreements were not conveyed to ConRail, which acquired the properties free and clear; and that the Special Court lacked jurisdiction over the claims asserted by petitioners against Penn Central. *Stratford Land and Improvement Company, Inc. v. Blanchette*, 448 F.Supp. 279 (Special Ct., 1978). The Court noted the following circumstances:

The conveyance documents (Bill of Sale and Assignment, Schedule E, annexed to conveyance order of March 25, 1976) specifically excluded "all industrial sidetrack agreements . . . which require the payment of refunds per car, trailer, or container to any person, firm, association . . . ." While this exclusion would be impermissible if inconsistent with the Final System Plan; and while the "general principles" established in the Final System Plan included the statement "executory contracts and agreements are designated in accordance with their subject matter: contracts relating to property to go with the property . . . ," the Court concluded that U.S. Railway Association had adequately reserved the power to take a closer

look at specific categories of administrative assets at a later time, and to depart from the stated "general principles." The Court reasoned that

". . . the Association anticipated, and Congress approved, precisely the sort of refinements USRA later effected in the Bill of Sale. The sidetrack exception was wholly consistent with the general scheme of the Rail Act and of the FSP that ConRail was to emerge with the rail properties designated for it, for which just compensation would be paid, but without the attending financial obligations . . . A requirement that ConRail assume all of a transferor's executory obligations related to the properties conveyed would run counter to the basic design of the FSP to develop a 'financially self-sustaining and express service system in the region' (§ 206(a)(1)). We therefore hold that the sidetrack exception in the Bill of Sale was not inconsistent with the FSP" (448 F.Supp. at 284–85).

The Special Court's decision has not been appealed, and thus stands as a final determination that ConRail has no liability to the petitioners under these sidetrack agreements. The Special Court, of course, expressed no view as to the existence of any residual liability of Penn Central under the agreements.

## II. THE TERMS OF THE AGREEMENTS

The sidetracks are still generating freight business, the shippers are paying freight charges in full, and the shippers have not yet been reimbursed the full cost of the sidetrack improvements; but Penn Central is not receiving the freight revenues from which, in the contemplation of both parties, the per-car refunds were to be made. The ultimate question to be decided in each case is whether Penn Central's reimbursement obligation survived the conveyance to ConRail and the resulting cessation of revenues. The first task of the Court is to determine whether the contracts themselves clearly provide the answer to the question. Be-

cause of their differing language, each of the agreements must be examined individually.

With respect to the 1974 GM agreement relating to Clark Avenue, the answer is reasonably clear. That agreement provides as follows:

> "(3) . . . Thereafter the Railroad will refund to Industry the balance of the advanced monies *solely by means of a refund of $54.73 per rail carload of motor vehicles handled over the support yard facilities, for Industry and routed to, from or via a point on Railroad, outside the local switching limits. In no event shall Railroad be obligated to refund any amounts advanced other than by means of such rail car refunds.* (Emphasis supplied)

I believe this language clearly specifies the source of the funds to be used in reimbursing GM, and limits Penn Central's reimbursement obligation to that source of funds.

While I believe the language of the agreement itself compels this conclusion, any possible doubt on that score is removed when consideration is given to the record before this Court at the time the Clark Avenue agreement was authorized. In support of their application for authority to enter into the agreement, the Trustees presented evidence in the form of an affidavit of Malcolm S. Sanders, dated July 15, 1974 (Doc. No. 7804), paragraph 7 of which states:

> ". . . As set forth in the agreement for support yard refund, the Trustees propose to repay the amount advanced by [GM] by means of a refund of $54.73 per carload handled by Penn Central at the new terminal. The obligation to repay will be limited solely to carload refunds, and there shall be no obligation to repay [GM] by any other means. [GM] has, in effect, agreed to assume the risk of a termination of operations by Penn Cen-

tral or a conveyance to ConRail prior to full repayment of the amount advanced. . . ."

In the absence of any contrary assertion at that hearing, the Court was plainly entitled to rely upon that representation in authorizing the Trustees to enter into the agreement. GM was certainly aware that Court approval was required; when GM later executed the agreement authorized by the Court, it was chargeable with knowledge of the representations made to the Court.[1]

I therefore hold that Penn Central's obligations under the Clark Avenue agreement terminated as of April 1, 1976.

The remaining two agreements are less clearcut on this issue. The 1973 GM agreement relating to Piquette Street provides that "the railroad shall make certain refunds to the Industry in accordance with the terms of a certain letter agreement between the parties hereto of even date herewith." The incorporated letter agreement (in which the Trustees are referred to as "the Railroad") provides that, after the construction work is completed and paid for by GM,

> "(2) . . . Thereafter, the Railroad will refund to the Industry $20 per car on all carload shipments passing over this sidetrack for the Industry and routed to, from or via a point on the railroad, outside the local switching limits.
>
> "(3) At the end of each quarter during the reimbursement period, the Industry shall render to the Railroad a statement of such cars, and upon verification by the Railroad, reimbursement shall be made as aforesaid . . .
>
> "(4) These refunds will continue for a period of five years from the date the sidetrack is placed in service, with one year extensions until the amount advanced has been fully repaid. . . ."

The operative language of the Stratford agreement, executed in 1971, is:

> "2) The Trustees agree:

---

1. GM has filed an affidavit of one Victor A. Long, taking issue with Mr. Sanders' interpretation of the agreement. Not only does this come much too late (since it should have been presented at the July 15, 1974 hearing), but, upon close examination, it is curiously devoid of factual assertions contrary to the Sanders' affidavit.

"(a) [to maintain and repair the tracks]

"(b) [to maintain and repair certain signals]

"(c) to refund to [Stratford], their successors or assigns [construction costs estimated to total $679,000]. Refunds shall be made at the rate of:

"$10 per car for cars yielding revenue of from $150 to $200

.    .    .    .    .

"$50 per car for cars yielding revenue of from $450 and up

"No refunds shall be made for cars yielding revenue of less than $149.99. With respect to cars consigned to or received from [a specified shipper] refunds shall be calculated only on such cars as exceed 400 in any one-year period from the date of this agreement. As to cars on which storage in transit privilege is accorded, refunds shall be calculated on the inbound cars only. The refunds shall be made for a period beginning on the date the first revenue car is received or forwarded . . . and ending ten (10) years thereafter or when developers' costs of construction . . . shall have been refunded in full, whichever event occurs earlier."

If the parties intended the term "refund" to mean a refund of revenues derived from freight traffic on the siding, it would follow that here, too, Penn Central's obligation terminated as of April 1, 1976. But if the parties meant that Penn Central would "refund" the cost of construction, and that the per-car formula would merely determine the rate at which the reimbursement of construction costs would occur, a different conclusion might be justified. In my judgment, the latter is the correct interpretation of the contract language. This is particularly true of the Stratford agreement, in which the Penn Central Trustees expressly agreed to "refund" the specified construction costs, at a "rate" determined by the per-car formula. The GM Piquette Avenue agreement is not as clear, but does appear to use the terms "refund" and "reimbursement" interchangeably, in referring both to construction costs and per-car revenues.

As a matter of construing the contract language, therefore, Penn Central's assertion of non-liability cannot be sustained.

### III. IMPOSSIBILITY OF PERFORMANCE; CONTRACT-FRUSTRATION

From the standpoint of Penn Central, it can be said that the contracting parties contemplated that Penn Central would receive (1) the capital improvement represented by the sidetrack construction, and (2) the additional freight revenues which would enable it to pay for these improvements and make a profit thereon. By operation of law, Penn Central has been deprived of the additional freight revenues; it no longer owns the capital improvements, and is unlikely to be paid enough for them to cover the construction costs. Penn Central's argument that the RRRA has frustrated the intent of the contracting parties, and has rendered performance impossible, thus freeing both parties from any further obligations under the agreement, is not lacking in substance. From the standpoint of the petitioners, however, it can be said that they have fully performed their part of the bargain; that performance of the contract by Penn Central to the extent of paying the balance due has not been rendered impossible; and that, at least in theory, Penn Central should be made whole by means of the Valuation Case litigation.

Conceptually, the petitioners have, I believe, the better argument. Broadly speaking, none of the rail assets conveyed to ConRail were fully paid for, but ConRail acquired clear title and Penn Central remained liable on its bonds and other forms of indebtedness (in accordance with their terms, and subject to the bankruptcy powers of the reorganization court). In a sense, the Trustees borrowed money from the shippers to finance the sidetrack construction. The fact that the sidetracks have been conveyed to ConRail is not the crucial issue; what is important here is the nature of the repayment obligation. Unless the contracts themselves relieve Penn Central of any post-conveyance obligation to repay,

it cannot be said that the RRRA terminated that obligation, although it may, of necessity, alter the form and timing of its fulfillment.

A hypothetical example may be useful in this analysis. Let us suppose that A owns an apartment house, and contracts with B to install a new roof. The agreement provides that A is to pay for the roof at the rate of $10 per month for each apartment unit for which rent is collected each month, until the full cost is paid. After the work is completed but before many payments have been made, the State exercises its power of eminent domain and acquires the property as part of a highway improvement project. In such circumstances, it cannot be doubted that B would have an enforceable right to the contract balance, with appropriate adjustment reflecting the timing of payment, either on the theory that the exercise of eminent domain had not rendered impossible A's payment of money, or because the arrangement between A and B would be deemed to have given B standing to share in the condemnation award, or by application of general equitable principles.

The analogy to the present case is not, of course, a perfect one. The likelihood that the value of a new roof on the apartment house would be reflected in the condemnation award is vastly greater than the likelihood that the value of sidetrack improvements will be reflected in the outcome of the Valuation Case. Moreover, the complex RRRA process does not neatly fit a condemnation mold. More importantly, perhaps, the relative rights of other creditors must be considered.

As contemplated by § 77 of the Bankruptcy Act, the Trustees continued to operate the railroad during reorganization, incurring and paying many obligations for operating expenses. But the extent to which they could lawfully incur obligations to finance capital improvements was severely restricted. With respect to these sidetrack improvements, the various Orders of this Court authorizing the execution and performance of the agreements plainly contemplated that no new general obligations of the estate would thereby be created; the sole justification for these agreements, and the sole reason for acquiescence therein by all of the other creditors of the estate, was the assumption that the increased freight revenues generated by the improvements, over and above any increased operating costs, would amortize the obligation. The frustration of that expectation, as a consequence of the RRRA, should not, in my judgment, totally relieve Penn Central of any further obligation to make the agreed-upon reimbursement, unless the language of the particular agreement compels that result. But this does not mean that the balance must now be paid in cash as a claim of administration. In the final analysis, we are dealing here with equitable considerations, and there are equities favoring the other creditors, as well as the shippers. To say that the shippers should not equitably be required to bear all of the risks associated with the RRRA process in this context unless they expressly agreed to bear those risks, is not to say that their rights have not been affected at all by the RRRA conveyance, or that all of the associated risks must be borne by others. Inasmuch as the hearings in this matter have been limited to issues of liability, rather than the amount and form of payment, questions in the latter category are left for future determination, if the parties are unable to agree upon an appropriate resolution.

## IV. CONCLUSIONS

It is my conclusion that Penn Central's obligations to make sidetrack refunds terminated as of April 1, 1976, in all cases in which the agreement contains language specifying the per-car freight revenues as the sole source of repayment, or otherwise clearly manifests an intention of the parties to that effect. Where the per-car formula merely reflects the rate of reimbursement, without limitation as to the source of funds, Penn Central's obligations did not terminate as of April 1, 1976, but the amount of Penn Central's remaining obligation (if any), and the manner of payment, must be resolved in further proceedings. The petition of General Motors Corporation with

respect to the Clark Avenue project will be dismissed. With respect to the remaining GM petition (Piquette) and the Stratford petition, Penn Central's responses will be treated as motions to dismiss, and said motions to dismiss will be denied.

ORDER NO. 3997

AND NOW, this 18th day of September, 1979, upon consideration of the Petition of Stratford Land and Improvement Company, Inc. and Stratford Industrial Corporation (Doc. No. 16495) and the Petition of General Motors Corporation (Doc. No. 16496), seeking payment of balances allegedly due under sidetrack agreements, it is ORDERED:

1. The Petition of General Motors Corporation, insofar as it relates to the Clark Avenue project, is DISMISSED.

2. It is hereby ADJUDGED AND DECLARED that the liability of Penn Central Corporation to General Motors Corporation in relation to the Piquette Avenue sidetrack refund agreement referred to in said Petition, and the liability of Penn Central Corporation to the Stratford petitioners referred to in their petition has not been terminated or extinguished by the conveyance of the rail properties to ConRail. The amount of liability, if any, and the form and manner of payment, shall be determined in further proceedings.